**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

FILED

| | | |
|---|---|---|
| U.S. BANK NATIONAL ASSOCIATION, | ) | JUL 0 1 2004 |
| | ) | |
| Appellant, | ) | MICHAEL W. DOBBINS |
| | ) No. 04-C-3357 | CLERK, U.S. DISTRICT COURT |
| v. | ) | |
| | ) Hon. Judge John W. Darrah | |
| | ) | |
| UNITED AIR LINES, INC., | ) Hon. Magistrate Judge Ian H. Levin | DOCKETED |
| Debtor, | ) | JUL 06 2004 |
| | ) | |
| Appellee. | ) | |

## RESPONSE OF APPELLEE UNITED AIR LINES, INC. IN OPPOSITION TO BRIEF OF APPELLANT U.S. BANK NATIONAL ASSOCIATION

James H.M. Sprayregen, P.C. (ARDC No. 6190206)
Marc Kieselstein (ARDC No. 6199255)
Todd Gale (ARDC No. 6229288)
KIRKLAND & ELLIS, LLP
200 East Randolph Drive
Chicago, Illinois 60601
Telephone: (312) 861-2000
Facsimile: (312) 861-2200

Counsel for Plaintiff / Appellee
United Air Lines, Inc.

<u>**TABLE OF CONTENTS**</u>

A.    STATEMENT OF THE BASIS OF APPELLATE JURISDICTION ..........................1

B.    COUNTER-STATEMENT OF THE ISSUES PRESENTED .........................................1

C.    APPLICABLE STANDARD OF APPELLATE REVIEW ...........................................1

D.    STATEMENT OF THE CASE...................................................................................1

    1.    Factual Background of the LAX Adversary Proceeding .........................................2

        (a)    *The Terminal Lease*.................................................................................2

        (b)    *The "Sublease"*.......................................................................................2

    2.    Background of United's Municipal Bond Adversaries...........................................4

    3.    The Decision of the Bankruptcy Court ...................................................................6

E.    SUMMARY OF ARGUMENT .................................................................................8

F.    ARGUMENT.............................................................................................................9

    1.    The Bankruptcy Court's Judgment As A Matter Of Law Is Proper .......................9

    2.    U.S. Bank's Confusing Web Of Proposed Legal Standards Form An
          Incoherent Analysis That Should Be Rejected .....................................................10

    3.    The Bankruptcy Court Correctly Applied The "Economic Substance"
          Factors To Determine That The LAX Sublease Is A Financing
          Arrangement .........................................................................................................10

    4.    The Bankruptcy Court Properly Applied The Economic Substance Factors
          To Determine That the LAX Sublease Is A Financing Arrangement, Not A
          True Lease..............................................................................................................13

        (a)    *The "Rent" United Pays Pursuant to the LAX Sublease Does Not
               Compensate for Use and Occupancy of the Facilities.*.............................14

        (b)    *The "Rent" Payments Are Directly Related to the Amount of
               Financing, Not the Property's Fair Market Value* ...................................15

        (c)    *The Bonds Were Issued to Finance Improvements For United's
               Sole Use and Benefit.*.............................................................................15

        (d)    *The Bond Agreements Were Stylized as "Leases" For a Specific
               Purpose.* ................................................................................................16

i

  *(e) United Has Taken On Many Typical Obligations of a Lessor*...................17

 5. United's Inability to Own The Improved Facilities Does Not Imply That The LAX Sublease Is A True Lease. ....................................................................19

 6. U.S. Bank's Attempt To Collapse The Multi-Factor Economic Realities Analysis Into "Touchstones" Should be Rejected. ..............................................22

 7. The Facts Underlying The Denver Airport Agreement Support United's Argument That The LAX Sublease Is A Financing Arrangement .......................22

 8. United's Alleged Representations Indicating An Intent to Create A True Lease  Do Not Establish That The LAX Sublease Is, In Fact, A True Lease........23

**G. CONCLUSION** ............................................................................................**24**

## TABLE OF AUTHORITIES

**Cases**

*Addison v. Burnett,*
41 Cal. App. 4th 1288, 1296 (Cal. Ct. App. 1996) ............................................................ 4

*Am. Sur. Co. of New York v. Sampsell,*
327 U.S. 269, 272 (1946) ................................................................................................... 11

*Frank Lyon Co. v. United States,*
435 U.S. 561, 584 (1978) ..................................................................................................... 6

*In re Hotel Syracuse,*
155 B.R. 824 (N.D. N.Y. 1993) .......................................................................... 6, 9, 10, 12, 2

*In re KAR Dev. Assocs.,*
180 B.R. 629, 639 (D. Kan. 1995) .............................................................. 12, 13, 15, 17

*In re Lunan Family Rests.,*
194 B.R. 429, 450 (Bankr. N.D. Ill. 1996) ...................................................................... 11

*In re Moreggia & Sons, Inc.,*
852 F.2d 1179, 1182 (9th Cir. 1988) ............................................................... 10, 11, 12

*In re Opelika Mfg. Corp.,*
67 B.R. 169, 171 (Bankr. N.D. Ill. 1986) ......................................................................... 10

*In re PCH Assocs.,*
804 F.2d 193 (2d Cir. 1986) ............................................................................................... 13

*In re Zaleha,*
159 B.R. 581, 585 (D. Idaho 1993) ..................................................................................... 4

*Kallman v. Radioshack Corp.,*
315 F.3d 731, 735 (7th Cir. 2002) ....................................................................................... 8

*Perez v. Cambell,*
402 U.S. 637, 652-53 (1971) ............................................................................................... 6

*SCCC Assocs.,*
158 B.R. at 1013 ................................................................................................................... 4

*Schwartzman v. Weiner,*
319 A.2d 48, 52 (Del. Super. Ct. 1974) ............................................................................ 15

*Westship, Inc. v. Trident Shipworks, Inc.,*
247 B.R. 856, 862 (M.D. Fla. 2000) ................................................................................. 11

**Other Authorities**

Elizabeth S. Goldman, *Controlling Legislative Shortsightedness: the Effectiveness of Constitutional Debt Limitations*, 1991 Wis. L. Rev. 1301 (1991).................................... 15

James Gadsden, *Recharacterization of Industrial Development Bond Real Property Leases in Bankruptcy Cases*, 113 Banking L. J. 466 (May, 1996)................................................... 15

S. Rep. No. 989, 95th Cong., 2d Sess. 64, 1978 U.S.C.C.A.N. 5787, 5850 ........................... 10, 3

**Rules**

Fed. R. Bankr. P. 7056 .................................................................................................................. 8

Fed. R. Civ. P 56(c) ..................................................................................................................... 8

## A.    STATEMENT OF THE BASIS OF APPELLATE JURISDICTION

Appellee United Air Lines, Inc. ("United," the "Debtor," "Plaintiff," or "Appellee") does not dispute the statement of the basis of appellate jurisdiction set forth in the appeal brief of Appellant U.S. Bank National Association ("U.S. Bank," "Defendant," or "Appellant").

## B.    COUNTER-STATEMENT OF THE ISSUES PRESENTED

United disagrees with the statement of issues set forth in Appellant's brief.   United respectfully states that the issue presented in this appeal is as follows:

Whether the Bankruptcy Court was correct in determining that the lease-and-leaseback entered into by United to obtain bond financing for construction of certain improvements to its facilities at Los Angeles International Airport ("LAX") was properly recharacterized as a financing arrangement.

## C.    APPLICABLE STANDARD OF APPELLATE REVIEW

United does not dispute the standard of appellate review set forth in Appellant's brief.

## D.    STATEMENT OF THE CASE

This is an appeal from Adversary Proceeding No. 03A00977 in Case No. 02-B-4819. This appeal stems from the March 30, 2004, decision by the Honorable Eugene R. Wedoff of the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, granting summary judgment in favor of United and denying U.S. Bank's cross-motion for summary judgment. *See* Memorandum of Decision and Order (Docket Nos. 128 & 129).[1]

---

[1] For purposes of this brief, "Docket" shall mean the docket of the Bankruptcy Court in Adversary Proceeding No. 03A00977 (Case No. 02-B-2819) and "Appeal Docket" shall mean the docket for this appeal to the District Court (Case No. 04-C-3357).

1.    Factual Background of the LAX Adversary Proceeding

U.S. Bank appeals from the Bankruptcy Court's interpretation of the sublease agreement dated November 15, 1982, between RAIC and United ("LAX Sublease"). All parties moved for summary judgment, in explicit agreement that no genuine issue of material fact exists.

        *(a)*    *The Terminal Lease*

In 1981, the City of Los Angeles ("Los Angeles") and United entered into a lease agreement (as amended, the "LAX Terminal Lease") that governs United's use and occupancy of certain terminal facilities at Los Angeles International Airport ("LAX"). *See* Complaint at, Ex. 1, ("Complaint") LAX Terminal Lease (Docket No. 1). The LAX Terminal Lease breaks the leased premises into various categories of space, including ticketing buildings, satellite buildings, baggage channels and ramps, ground areas, and connectors. *See id.,* at § 3. The rent that United pays to Los Angeles for the leased premises is based on the usage categories described above, and the size of the particular space. *See id.,* at § 6.

Pursuant to the Terminal Lease, United may use the leased premises for office space, training rooms, lounges, storage, service of food, flight planning rooms, and the carrying on of other operations and activities necessary or incidental to United's business. *See id.,* at § 7.

        *(b)*    *The "Sublease"*

At various times between 1982 and 1992, the Regional Airport Improvement Corporation ("RAIC") issued special facilities revenue bonds ("LAX Bonds").[2] United applied the proceeds from sale of the LAX Bonds to the construction and improvements of certain facilities at LAX (the "LAX Projects").

---

[2] The LAX Bonds are limited obligations of RAIC, payable solely from rentals paid by United to RAIC. *See* LAX Compl., Ex. 5, LAX Third Supp. Indenture, at Ex. B (Docket No. 1).

The LAX Bonds were issued pursuant to, among other agreements, a sublease agreement dated November 15, 1982, between RAIC and United ("LAX Sublease"), which "subleased" to United the facilities constructed and improved with the proceeds of the LAX Bonds.[3]  *See* Complaint at Ex. 2, LAX Sublease, § 2 (Docket No. 1).  The LAX Sublease required United to pay "rentals" (hereafter "LAX Financing Rent") in biannual payments which, in total, exactly equal the principal, premium, and interest on the LAX Bonds.  *See* LAX Sublease, Complaint at Ex. 2, § 4(a) (Docket No. 1).  Moreover, United pays additional rent under the LAX Supplemental Indenture equal to RAIC's expenses relating to the LAX Bonds.  *See* LAX Sublease, at § 4(b). Despite United's assignment of the Terminal Lease and its payment of LAX Financing Rent to the purported sublessor, United remains liable to make all payments to Los Angeles on the original Terminal Lease for the use of the "subleased" premises.  *See* Complaint at, Ex. 3, LAX Assignment, § 3(Docket No. 1).  Additionally, all LAX Financing Rent payments, and other revenues derived by RAIC from the LAX Projects, were assigned to, and deposited with, the LAX Bonds Trustee -- not Los Angeles or RAIC.  *See* Complaint at, Ex. 4, LAX Supp. Indenture, § 3.08 (Docket No. 1).

The term of the LAX Sublease expires upon the payment or redemption of the LAX Bonds.  *See* Complaint at Ex. 2, LAX Sublease, at § 3 (Docket No. 1).  Thus, United is not required to continue paying LAX Financing Rent once the aggregate sum of those payments is

---

[3] In addition to LAX Sublease, United, RAIC, Bank National Association as LAX trustee ("U.S. Bank"), and certain of other governmental entities entered into a series of related agreements including: (1) a partial assignment of the LAX Terminal Lease (the "LAX assignment"), *see* LAX: complaint, Ex. 3, LAX Assignment (Docket No. 1); (ii) the supplemental and Restated Indenture of Mortgage and Deed of Trust between RAIC and Croker National Bank, as LAX trustee, and predecessor–in–interest of U.S. Bank, *see* Complaint at, Ex. 4; LAX Supp. Indenture (Docket No. 1); (iii) the Third Supplemental Indenture of Mortgage and Deed of Trust between RAIC and First Trust of California, N.A., as LAX Trustee and predecessor-in-interest to U.S. Bank, *see* Complaint at, Ex. 5, LAX Third Supp. Indenture (Docket No. 1); and (iv) the Contingent Lease Agreement between Los Angeles and RAIC, *see* Complaint at Ex. 6, LAX Contingent Lease Agreement (together with the LAX sublease, the LAX Bond Agreements")(Docket No. 1).  The LAX Bond Agreements were entered into for the purpose of securing additional funding sources for construction of the LAX projects.

sufficient to satisfy and discharge the LAX Bonds, and once the bonds are fully paid, neither RAIC nor the Trustee would have any rights in the premises. *See id*. On the other hand, United's obligation to make payment under the LAX Sublease continues regardless of whether or not the leased premises, or any of the constructed facilities, are destroyed. *See id*. at § 5. Even if United ceased its possession of the LAX premises, it would still be required to make the LAX Financing Rent payments. *Id*.

Under the LAX Sublease, United is required to pay all taxes, maintenance, insurance, and all other costs incurred by RAIC in connection with the LAX premises. *See* Complaint at Ex. 2 LAX Sublease, at §§ 4, 11 (Docket No. 1). United has the right to freely construct improvements other than the LAX Projects, and has the right to connect with and utilize any and all utilities, installations, building service systems, and related appurtenances, provided that they do not materially interfere with the construction of the LAX Projects. *See id*. at § 20. United is obligated to fund any shortfalls in the event that the LAX Bonds are insufficient to support the cost of the construction of the facilities. *See id*. at § 5. On the contrary, RAIC is explicitly ***not*** responsible to United for the performance of the construction contracts in connection with the installation of the improvements. *See id*.

2.  Background of United's Municipal Bond Adversaries

On March 21, 2003, United filed adversary complaints against four different airports[4] (LAX, San Francisco International Airport ("SFO"), John F. Kennedy Airport ("JFK"), and

---

[4] United will only cite herein to the designated record, which includes pleadings, orders, and transcripts from the LAX adversary proceeding, 03A00977, as well as designations for the other related adversaries mentioned below to the extent that the pleadings in each of the four adversaries were filed together, the hearings for each of those adversaries were heard together, or the Bankruptcy Court ruled on each of those adversaries together. Those designations include: United's Memorandum in Support of Its Motion for Summary Judgment ("United's SJ Memo") (Docket No. 36); the 3/27/03 hearing on United's motions for a temporary restraining order; the 10/24/03 hearing on each of the parties summary judgment motions; and the Bankruptcy Court's Memorandum Opinion on the Summary Judgment Motions ("Memorandum of Decision") (Docket No. 128). For a full description of each of the adversaries, *see* United's SJ Memo (Docket No. 36), and the Memorandum of Decision (Docket No. 128).

Denver International Airport ("Denver")), the issuers of certain special facility bonds (to the extent such bonds were not issued by the operator of the airport), and the trustees of those bonds, seeking a declaratory judgment by the Bankruptcy Court that: 1) certain agreements labeled as "leases" were not "true leases" under the bankruptcy law, but instead were financing arrangements; and 2) the financing arrangements were not integrated with, or were separate and distinct from, the true leases governing United's use and occupancy of the facilities located at each of those airports. Shortly thereafter, United moved for summary judgment on those same issues. *See* United's SJ Memo and Motion (Docket Nos. 34 and 36). The Bankruptcy Court allowed a fact discovery period before the defendants were required to respond to the summary judgment motions.

On or about August 22, 2003, the defendants filed a response brief to United's motion for summary judgment as well as cross-motions for summary judgment. *See* Memorandum in Opposition to United's Motion for Summary Judgment in Support of the City of Los Angeles' Cross-Motion for Summary Judgment (Docket No. 56). United replied to its summary judgment briefs and responded to the cross-motions for summary judgment on September 5, 2003. *See* United's Reply Memorandum in Support of Its Motion for Summary Judgment and in Opposition to Cross-Motions for Summary Judgment ("United's SJ Reply") (Docket No. 79). The defendants then filed a reply to their cross-motions for summary judgment on September 12, 2003. *See* Memorandum of the City of Los Angeles in Reply to Opposition of United Air Lines, Inc. to the City of Los Angeles' Cross-Motion for Summary Judgment (Docket No. 95). A summary judgment hearing for each of the four adversaries was held on October 24, 2003. *See* 10/24/03 Hearing Transcript, at 43-96. On March 30, 2004, the Bankruptcy Court ruled on each of the summary judgment matters, finding in favor of United and against defendants in the LAX,

SFO, and JFK proceedings, and against United and for the Denver defendants. *See* Memorandum of Decision and Order (Docket Nos. 128 and 129).

The Defendants in the SFO and JFK adversary proceedings each filed a notice of appeal against United on or about April 8, 2004, and a statement of issues and designations on or about April 19, 2004. United also appealed the Court's ruling with respect to the Denver adversary proceeding at this time. Each of these appeals was transmitted to this Court on or about April 21, 2004. Upon a joint motion of the parties to each appeal, this Court entered a scheduling order providing that appellant briefs are due on June 10, 2004, appellee briefs on July 1, 2004, and reply briefs on July 15, 2004. The Court also set a status hearing for August 25, 2004.

Shortly thereafter, on April 27, 2004, the LAX Defendants each filed a notice of appeal against United. On May 7, 2004, the LAX Defendants filed their statements of issues and designations. The LAX appeals were transmitted to this Court on May 12, 2004, and the Court entered the same briefing and status hearing schedule that it had entered for the Denver, SFO, and JFK appeals.

### 3. The Decision of the Bankruptcy Court

The Bankruptcy Court correctly applied an "economic realities" analysis to determine that the LAX Sublease is not a true lease and is properly recharacterized as a financing arrangement. *See* Memorandum of Decision, at 18-26 (Docket No. 128). Specifically, the Bankruptcy Court determined that the LAX Sublease is not a true lease because: 1) United has no right to terminate the leaseback before the redemption of the bonds issued by the agency for United's benefit; 2) the leasehold interest transferred from United and the leaseback of that interest to United both have the same term, coinciding with the redemption of bonds; and 3) the rent payable by United exactly equals the debt service and administrative expenses connected to the bond issues. *Id.* at 20-21. The Bankruptcy Court distinguished the transaction from a true

6

lease, where the leased property returns to the lessor at the end of the lease term with substantial value remaining. Here, the leasehold's "entire economic value is exhausted during the leaseback, and nothing reverts to the [lessor]." *Id.*

The Bankruptcy Court then analyzed the transaction in view of the 5 factors set forth in *In re Hotel Syracuse*, 155 B.R. 824 (N.D. N.Y. 1993) and confirmed its conclusion that the transaction was not a true lease. *See* Memorandum of Decision, at 21-23 (Docket No. 128). The Bankruptcy Court noted that: 1) the rental payments from United under the leasebacks were not calculated to compensate the agencies for the use of the transferred leasehold, but were defined by the amounts needed to pay the bonds; 2) the agencies did not acquire the interests that they leased back to United for market value; 3) the property interest involved in the leasebacks (the leasehold interest under the ground leases) was acquired by the agencies specifically for United's use; 4) the leases were part of an arrangement structured to obtain tax advantages; and 5) the lessee, United, had all of the ordinary obligations associated with ownership, including the need to maintain insurance and pay property taxes. *Id.* Finally, the Bankruptcy Court determined that the LAX agreements are the economic equivalent of a leasehold mortgage, which is a recognized real estate financing mechanism and supports the conclusion that the leaseback is a financing arrangement. *Id.* at 23-24.

The Bankruptcy Court declined to apply state law to analyze the LAX Sublease. "Because the Bankruptcy Code itself uses 'lease' in § 365 to mean a true lease, state law should not be used to reach a contrary result." Memorandum of Decision at 18 n. 6 (Docket No. 128) (citing *Perez v. Cambell*, 402 U.S. 637, 652-53 (1971) (recognizing that "any state legislation which frustrates the full effectiveness of federal law is rendered invalid by the Supremacy Clause.")).

E.    **SUMMARY OF ARGUMENT**

U.S. Bank raises several arguments to support its assertion that the Bankruptcy Court erred in holding that the LAX Sublease is a financing arrangement and not a "true lease." However, upon closer inspection, most of the arguments raised by U.S. Bank can be reduced to a single argument that is restated in different forms throughout Appellant's brief. Specifically, U.S. Bank repeatedly argues that the LAX Sublease must be characterized as a "true lease" because there is no provision in the agreement that allows United to purchase or own the airport facilities at issue at the end of the term of the agreement even though the improved facilities will still have value when the agreement is concluded. U.S. Bank maintains that the lack of such a purchase provision in the LAX Sublease is a defining characteristic that proves that the agreement is actually a true lease. *See* Appellant's Brief at 16 (Appeal Docket No. 12).

As discussed in detail below, U.S. Bank's argument is inconsistent with the Bankruptcy Code, its legislative history, and the applicable case law, which requires a court to look to the "economic realities" of the entire agreement rather than to one single factor. The reasoning advanced by the cases cited by U.S. Bank is that the borrower has the right to get back the same interest it had prior to the financing transaction. In this case, United merely held a leasehold interest in and to the underlying airport property prior to the issuance of the Bonds. As a logical result, United does not have the right to purchase the improved airport facility merely as a consequence of the financing.

Moreover, U.S. Bank's argument is somewhat disingenuous because, as U.S. Bank is well aware, United is barred by law from owing or purchasing the improved LAX airport facilities. Rather, the law requires that title to the improved airport facilities remain with the public. If the Bankruptcy Court had agreed with U.S. Bank's argument that the lack of a "take back" or purchase provision conclusively establishes that the LAX Sublease is a true lease, it

8

would have created a *per se* rule that any agreements involving airport facilities are always true leases since most jurisdictions require that title to airport facilities remain in the possession of a governmental entity. However, the Bankruptcy Code does not contain such a *per se* rule. The law instead requires the Bankruptcy Court to look at all the facts to determine whether the "lessor" is acting as a banker or a landlord. There is no question that the facts here indicate that the "lessor" in the present instance is acting not as a landlord, but as a banker to finance improvements at LAX.

**F.**    **ARGUMENT**

     1.    <u>The Bankruptcy Court's Judgment As A Matter Of Law Is Proper.</u>

The parties agree that summary judgment is proper when "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P 56(c); Fed. R. Bankr. P. 7056; Appellant's Brief at VII (Appeal Docket No. 12). The parties also agree that the LAX Sublease is unambiguous. *See* Appellant's Brief at 1-4 (Appeal Docket No. 12). Therefore, there is no dispute that the issue here – whether the LAX Sublease constitutes a disguised financing arrangement – is a matter of contract interpretation, and appropriate for summary judgment. *See Kallman v. Radioshack Corp.,* 315 F.3d 731, 735 (7th Cir. 2002) ("We note that interpretation of the terms of an unambiguous contract is traditionally a question of law and is particularly suited to disposition on summary judgment.")

Because the parties affirmatively and unanimously agree that the agreements at issue are unambiguous, the Bankruptcy Court's summary judgment decision was appropriate. *See id.; Hotel Syracuse,* 155 B.R. at 843 (granting summary judgment in favor of the debtor where "the economic substance of the Lease belies its true nature as a financing vehicle"). U.S. Bank's dissatisfaction with the Bankruptcy Court's decision cannot justify revisiting that ruling.

9

2. U.S. Bank's Confusing Web Of Proposed Legal Standards Form An Incoherent Analysis That Should Be Rejected.

U.S. Bank argues that the Bankruptcy Court erroneously applied the wrong standard to determine whether the LAX Sublease is a true lease. Appellant's Brief at 10-13 (Appeal Docket No. 12). However, in proposing its legal standard, U.S. Bank contradicts itself and sets forth a confusing and incoherent analysis that it then attempts to apply in its favor.

First, U.S. Bank states that the Bankruptcy Court should have applied a "totality of the circumstances" test to evaluate whether the LAX Sublease is a true lease for purposes of the Bankruptcy Code rather that the economic realities test applied by the Bankruptcy Court. Appellant's Brief, at 10 (Appeal Docket No. 12). However, U.S. Bank does not cite to any authority expressly stating that a "totality of the circumstances test" is appropriate or any decisions that apply such a test. In any event, U.S. Bank then backs away from the totality of the circumstances test and asserts that "the single most important factor which generally trumps all others in the true lease analysis is the projected residual value of the property upon expiration of the lease." Appellant's Brief, at 11 (Appeal Docket No. 12). After making this assertion, U.S. Bank next argues that the majority of courts actually focus on so-called "touchstones" to determine if a transaction is a true lease. Appellant's Brief, at 12 (Appeal Docket No. 12). Finally, U.S. Bank contradicts itself again by stating that many courts place a "heavy emphasis" on the intent of the parties at the time of the transaction to determine if a true lease exists. Appellant's Brief, at 13 (Appeal Docket No. 12).[5] U.S. Bank's web of contradiction presents an incoherent and confusing analysis that should be rejected.

3. The Bankruptcy Court Correctly Applied The "Economic Substance" Factors To Determine That The LAX Sublease Is A Financing Arrangement

---

[5] U.S. Bank also argues, without explanation, that the Bankruptcy Court was wrong in holding that the LAX Sublease is the economic equivalent of a leasehold mortgage. Appellant's Brief, at 26 (Docket No. 12).

In determining whether an instrument is a financing arrangement or a "true lease," the Court should look beyond the form of the transaction and the name given the transaction to its economic reality. *See In re Moreggia & Sons, Inc.*, 852 F.2d 1179, 1182 (9th Cir. 1988); *In re Opelika Mfg. Corp.*, 67 B.R. 169, 171 (Bankr. N.D. Ill. 1986). This determination is essential to properly and fairly compensate a debtor's creditors on equal ground. Where security transactions, loans, and other financing arrangements can be couched in lease terms, and can thereby be assumed by the bankrupt estate, the "lessor" gains a distinct advantage at the expense of other creditors without a concomitant benefit to the bankrupt estate. *Hotel Syracuse,* 155 B.R. at 841.

In this regard, the legislative history of the Bankruptcy Code states that the rules governing leases (including the applicability of Section 365(d)(3)) are not intended to apply to financing arrangements:

> As used in Section 502(b)(7), the phrase "lease of real property" applies only to a "true" or "bona fide" lease and does not apply to financing leases of real property or interests therein, or to leases of such property which are intended as security. . . . In a financing lease the lessor is essentially a secured or unsecured creditor (depending upon whether his interest is perfected or not) of the debtor, and the lessor's claim should not be subject to the 502(b)(7) limitation. Financing "leases" are in substance installment sales or loans. The "lessors" are essentially sellers or lenders and should be treated as such for purposes of the bankruptcy law. . . . Whether a "lease" is [a] true or bona fide lease or, in the alternative, a financing "lease" or a lease intended as security, depends upon the circumstances of each case. ***The distinction between a true lease and a financing transaction is based upon the economic substance of the transaction and not, for example, upon the locus of title, the form of the transaction or the fact that the transaction is denominated as a "lease."***

S. Rep. No. 989, 95th Cong., 2d Sess. 64, 1978 U.S.C.C.A.N. 5787, 5850 (emphasis added); *see also In re Lunan Family Rests.*, 194 B.R. 429, 450 (Bankr. N.D. Ill. 1996) (relying on this legislative history to analyze an agreement under Section 365); *Moreggia*, 852 F.2d at 1182.

"To determine whether a lease is a true or bona fide lease some courts look to state law while other courts have turned to the Bankruptcy Code and accompanying legislative history." *Westship, Inc. v. Trident Shipworks, Inc.*, 247 B.R. 856, 862 (M.D. Fla. 2000). However, "the extent to which state law is to be considered is in the last analysis a matter of federal law." *Id.* (quoting *Am. Sur. Co. of New York v. Sampsell*, 327 U.S. 269, 272 (1946)). Accordingly, even if an agreement may technically qualify as a lease under state law for other purposes, a court can, and should, investigate the true purpose of the agreement for the benefit of the creditors pursuant to Section 365 of the Bankruptcy Code. *See id.* at 863 ("Regardless of whether a court relies on legislative history or state law, however, the executory contract or lease must be viewed through the policies underlying the Bankruptcy Code."); *Moreggia*, 852 F.2d at 1182 ("not every interest that might qualify as a lease under state law is subject to the automatic rejection provision of Section 365. Our analysis of the Bankruptcy Code and the legislative history and purpose of Section 365(d)(4) convinces us that the appropriate focus is on the federal law purposes of Section 365(d)(4) and the economic realities of this particular arrangement.")

Accordingly, the Ninth Circuit has refused to require assumption or rejection of a purported lease that is in substance a financing arrangement, even where that agreement had taken on the surface formalities of an unexpired lease that might otherwise come within the ambit of Section 365. *See Moreggia*, 852 F.2d at 1182. Likewise, courts located in the Second and Tenth Circuits have decided that the economic substance of a transaction, rather than state law, is the proper basis for deciding whether a transaction is a lease for the purposes of Section 365. *See Hotel Syracuse*, 155 B.R. at 838-839 (granting debtor's motion for summary judgment on issue of whether agreement was a "true lease" for purposes of Section 365 of the Bankruptcy Code without consideration of state law); *In re Kar Dev. Assocs.*, 180 B.R. at 638-639 (affirming

12

summary judgment on appeal on issue of whether agreement was a "true lease" for purposes of Section 365 of the Bankruptcy Code without use of state law). Therefore, the Bankruptcy Court's reliance and application of the "economic substance" analysis, as set forth under federal law, was proper.

Indeed, U.S. Bank itself approvingly cites several federal cases for various propositions, even though these cases apply federal – not state – law to the question of the nature of the lease. *See, e.g., In re PCH Assocs.*, 804 F.2d 193 (2d Cir. 1986) (applying federal law to determine whether lease was a true lease) (cited in Appellant's Brief, at 10, 11, 13, 17, 24) (Appeal Docket No. 12).

> 4. The Bankruptcy Court Properly Applied The Economic Substance Factors To Determine That the LAX Sublease Is A Financing Arrangement, Not A True Lease.

Courts considering whether an agreement represents a "true lease" apply the following five factors: (1) whether the amount of rent was calculated to compensate for use of the land or, instead, was based on some other purpose, such as ensuring a particular return on an investment; (2) whether the purchase price was related to the fair market value of the land, or whether it was calculated as the amount necessary to finance the transaction; (3) whether the property was purchased by the lessor specifically for the lessee's use; (4) whether the transaction was called a lease in order to gain certain advantages such as tax treatment and the like; and (5) whether the lessee assumed many of the obligations normally reserved for the lessor. *See Hotel Syracuse,* 155 B.R. at 838-839; *In re KAR Dev. Assocs.,* 180 B.R. 629, 639 (D. Kan. 1995). As the Bankruptcy Court correctly found, these factors support a finding that the Bond Agreements are actually in the nature of "disguised" financing arrangements to which Section 365 of the Bankruptcy Code does not apply.

13

     (a)     *The "Rent" United Pays Pursuant to the LAX Sublease Does Not Compensate for Use and Occupancy of the Facilities.*

Calculation of the "rent" under the LAX Sublease shows that the LAX Sublease is a "disguised" financing arrangement rather than a "true lease." Indeed, United's obligation to pay "rent" under the LAX Sublease is unrelated to United's use of the LAX Projects or any other property. Thus, the Bankruptcy Court properly recharacterized the LAX Sublease.

The LAX Financing Rentals payable under the LAX Sublease must be in an amount sufficient to pay (when due) the principal, premium, if any, and interest on the LAX Bonds. *See* Complaint at Ex. 2, LAX Sublease, § 4(a) (Docket No. 1). Furthermore, the term of the LAX Sublease expires upon payment or redemption of the LAX Bonds. *Id.* at § 3 (Docket No. 1). All Financing Rentals paid under the LAX Sublease and other revenues derived by RAIC from the LAX Projects are assigned to, and deposited with, the LAX Bonds Trustee – *not* Los Angeles or RAIC. *See* Complaint at Ex. 4, LAX Supp. Indenture, § 3.08 (Docket No. 1). The LAX Bonds are limited obligations of RAIC, payable solely from the LAX Financing Rent United pays and other amounts to be received by RAIC under the LAX Sublease. *See* Complaint at Ex. 4, LAX Indenture, Ex. B (Docket No. 1). Moreover, United pays "additional rent" under the LAX Supplemental Indenture that is equal to RAIC's expenses relating to the LAX Bonds. *See* Complaint at Ex. 2, LAX Sublease, § 4(b) (Docket No. 1).

Thus, not only is United's obligation to pay "rent" under the LAX Sublease not connected to any actual use of the LAX Projects (or any other property), but this "rent" also coincides exactly with the amounts due under the LAX Bonds. All the while, United continues to separately pay true rent to Los Angeles so that it can continue its use and occupancy under the LAX Terminal Lease. *See* Complaint at Ex. 1, LAX Terminal Lease, § 6 (Docket No. 1). Finally, notwithstanding the assignment of the LAX Terminal Lease pursuant to the LAX

14

Assignment, United remains liable for all obligations under the LAX Terminal Lease. *See* Complaint at Ex. 3, LAX Assignment, § 3 (Docket No. 1).

> (b) *The "Rent" Payments Are Directly Related to the Amount of Financing, Not the Property's Fair Market Value*

In the context of secured financing transactions, the relevant issue for this factor is whether the "purchase price" was related to the fair market value of the land, or whether it was calculated as the amount necessary to finance the transaction. *See Hotel Syracuse*, 155 B.R. at 838-39; *KAR Dev. Assocs., L.P.*, 180 B.R. at 639. In the present context, however, title to the property never passes and, therefore, the relevant issue is whether the "rent" United pays pursuant to the Bond Agreements is related to the fair market value or the amount of financing. In each case, this "rent" amount is directly related to the amount of financing, not the property's fair market value.

The LAX Financing Rent United pays pursuant to the LAX Sublease was calculated based upon the amount necessary to finance the LAX Projects, not upon the fair market value of the land. Indeed, this "rent" equals the amount of the principal and interest on the LAX Bonds used to construct the LAX Projects. *See* Complaint at Ex. 2, LAX Sublease, § 4(a) (Docket No. 1). Moreover, United makes separate, true rent payments to Los Angeles for its use and occupancy of terminal facilities at LAX. *See* Complaint at Ex. 1, LAX Terminal Lease, § 6 (Docket No. 1). Thus, the LAX Financing Rent payments are directly related to the amount of financing, *not* the fair market value of any property United uses at LAX.

> (c) *The Bonds Were Issued to Finance Improvements For United's Sole Use and Benefit.*

Normally, under a "true lease," any improvements to a property would ultimately be for the landlord's – rather than the lessee's – benefit. *See, e.g., Schwartzman v. Weiner*, 319 A.2d 48, 52 (Del. Super. Ct. 1974). With respect to this third factor, the Bonds were issued to finance

15

the Projects at the various airports for United's sole benefit. Although the airport owners and the airline passengers traveling through the airports benefit indirectly from the Projects, there is no resulting benefit to any of the Trustees. *See, e.g., Hotel Syracuse*, 155 B.R. at 839 ("disguised financing" arrangement found where the hotel premises were acquired by a public industrial development agency to benefit the debtor by providing low cost financing for refurbishment and for expansion of the original hotel, notwithstanding the fact that the agency acted in furtherance of its statutory purpose of promoting job opportunities and economic development in Syracuse). Thus, the Bankruptcy Court properly concluded that the "property interest involved in the leasebacks (the leasehold interest under the ground leases) was acquired by the agencies specifically for United's use." Court's Memorandum of Decision, at 22 (Docket No. 128).

(d) *The Bond Agreements Were Stylized as "Leases" For a Specific Purpose.*

Public authorities have historically structured special facility bond financings through "leasing" arrangements as a means to avoid certain constitutional debt limitations in order to obtain tax exempt municipal bond financing rates. *See* Elizabeth S. Goldman, *Controlling Legislative Shortsightedness: the Effectiveness of Constitutional Debt Limitations*, 1991 Wis. L. Rev. 1301, 1330-33 (1991) (United's SJ Memo at Ex. B (Docket No. 36)). Such debt limitations have ranged from limitations on the amount of permitted public debt to outright bans on public debt for private projects. *Id.* at 1305, n.15. As special facility bond financings are backed solely by revenues from the project, instead of public tax dollars, the public authority is able to argue that the borrowing does not constitute "debt" of the public authority. Consequently, the public authority is able to offer access to low-cost financing, inherent with tax-exempt special facility revenue bonds, while escaping constitutional debt limitations. *See* James Gadsden, *Recharacterization of Industrial Development Bond Real Property Leases in Bankruptcy Cases*, 113 Banking L. J. 466, 470 (May, 1996) (noting that the structure of industrial development

16

bonds, which are structured similarly to special facility revenue bonds, "reflects no more than the historical antecedents in qualifying for the tax exemptions available to municipalities.") (United's SJ Memo at Ex. C (Docket No. 36)).

While it is true that there were other tax-advantaged methods to obtain financing for the LAX Projects, the question posed by this factor is not whether this was the *only* potential tax-free financing option, but whether or not the lease structure was employed for the purpose of reducing the cost of financing rather than the ordinary and normal purpose of a lease structure: to permit the use and occupancy of the lessor's property in exchange for regular payments. In this case, the Bankruptcy Court rightfully found that the parties were conscious of, and in fact directed their decision to structure the transaction as a lease based upon, considerations relating to the cost of financing

### (e) *United Has Taken On Many Typical Obligations of a Lessor.*

A true lessee would not take on many of the burdens of ownership typically borne by the landlord. These include such things as paying cost overruns, assuming liability for construction contracts, paying taxes, repairs and maintenance, providing insurance, and the sole right to alter the facility and make improvements on the land. See *Kar Assocs.*, 180 B.R. at 639; *see also Opelika Mfg. Corp.*, 67 B.R. at 171-172, (applying Georgia law) (determining that allowing the lessee to make modifications at its own discretion weighed in favor of the lease being construed as a financing arrangement). However, in a financing transaction the lessee performs as the owner or lessor of the property. Unlike a typical lessee in a true lease transaction, United has taken on many of these burdens that are usually borne by the lessor, showing that the agreements at issue are really disguised financing arrangements rather than true leases.

Under the LAX Sublease, United pays all taxes, maintenance, insurance, and all costs incurred by RAIC. *See* Complaint at Ex. 2, LAX Sublease, §§ 4 and 11 (Docket No. 1).

17

Furthermore, United has the right to freely construct improvements other than the LAX Projects, together with the right to connect with and utilize any and all utilities, installations, buildings service systems, and related appurtenances, provided they do not materially interfere with the construction of the LAX Projects. *See* Complaint at Ex. 2, LAX Sublease, § 20 (Docket No. 1). Such a right would not typically be granted to a "true" lessee. Also, United is obligated to fund any shortfalls in the event that the LAX Bonds are insufficient to fund the cost of the construction of the facilities. *See* Complaint at Ex. 2, LAX Sublease, § 5 (Docket No. 1). Moreover, the LAX Sublease makes clear that RAIC is not responsible to United for the performance of the construction contracts in connection with the installation of the improvements. *See* Complaint at Ex. 2, LAX Sublease, § 5 (Docket No. 1). A "true" lessee would typically not assume liability for cost overruns or insufficient financing proceeds. Moreover, a "true" lessee, though often acting as the project manager of the construction of improvements to be leased, is typically indemnified by the owner for whom the improvements are ultimately constructed. This is not coincidental because United is not, for purposes of the LAX Sublease, a "true" lessee.

5.   United's Inability to Own The Improved Facilities Does Not Imply That The LAX Sublease Is A True Lease.

U.S. Bank contends that the Bankruptcy Court erroneously applied the *Hotel Syracuse* factors and failed to properly consider the fact that United had no option to purchase the improved facilities at the end of the agreement even though the facilities will have significant residual value. Appellant's Brief at 14-16, 19-26 (Appeal Docket No. 12). U.S. Bank also contends that the Bankruptcy Court incorrectly determined that the LAX Sublease is equivalent to a leasehold mortgage. *Id*. at 26. These arguments are essentially the same. They are both based on U.S. Bank's contention that the LAX Sublease must be characterized as a true lease because United does not have the right to purchase or own the improved airport facilities at the end of the agreement. U.S. Bank's arguments are without merit.

The LAX Sublease is an agreement that involves airport special facility revenue bonds. However, there is no well established body of case law dealing with the recharacterization of agreements related to such bonds. Industrial revenue bonds are similar in many respects to the airport special facility revenue bonds. Thus, the Bankruptcy Court and the respective parties have looked to the body of authority relating to the recharacterization of agreements that deal with industrial revenue bonds for guidance in characterizing the LAX Sublease.

Industrial revenue bonds are typically used to improve properties such as large manufacturing plants or industrial facilities. Typically, the facility owner turns over title to the property to a governmental entity in return for favorable financing through use of the industrial revenue bonds. The money raised from the bonds is used to improve the facility, and the facility is then "leased" back to the former owner, whose "rent" pays off the bonds. The agreement typically includes a "take back" provision allowing the former owner to regain title to the improved property at the end of the agreement for a nominal fee or no fee at all. Such

19

arrangements are usually characterized as a financing arrangement and not a true lease since the lessor is acting as a banker to fund the industrial improvements and not as a landlord.

The cases cited by the parties and the Bankruptcy Court that involve industrial revenue bonds set forth multiple factors that can be used to determine whether an agreement is a true lease or a financing arrangement. One factor set forth in some of those cases is whether the agreement at issue contains a purchase or "take back" provision *See Hotel Syracuse*, 155 B.R. at 838. Under the reasoning of *Hotel Syracuse* and the related case law, the presence of a "take back" provision tends to show that the agreement is a financing arrangement while the absence of such a provision tends to show that agreement is a true lease.

The reasoning advanced by these cases is that the borrower has the right to get back the same interest it had prior to the financing transaction, be it fee simple title, a leasehold, or other interest. Though industrial revenue bonds and airport special facility revenue bonds have many similarities, in the latter case the borrower typically does not hold title to the unimproved airport property prior to the financing. Rather, the borrower in airport special facility revenue bonds typically holds only a leasehold interest. So once the financing has been repaid, the borrower would not "take back" title it never held.

In this case, United merely held a leasehold interest in and to the underlying airport property prior to the issuance of the Bonds. As a logical result, United does not have the right to purchase the improved airport facility merely as a consequence of the financing. Instead, United's interest, if any, is a leasehold interest – the same as that immediately prior to the financing.

It is undisputed that United cannot own the improved airport facilities at LAX since, by law, title must rest in the public authority having title to the entire airport facility. *See* Complaint

at, Exhibit 2, LAX Sublease § 3 (Docket No. 1). Thus, U.S. Banks' argument that the LAX Sublease is a true lease because there is no purchase provision is wrong as a matter of law since, as U.S. Bank well knows, such a provision is not permitted under the law.

Moreover, the drafters of Section 365 of the Bankruptcy Code stated that financing leases, which are not "true" leases for purposes of bankruptcy, "are in substance installment sales *or loans*. . . . The 'lessors' are essentially sellers *or lenders* and should be treated as such for purposes of bankruptcy law." S. Rep. No. 989, 95th Cong., 2d Sess. 64, 1978 U.S.C.C.A.N. 5787 (emphasis added). The drafters further stated that, where there is a financing lease, "[t]he rental payments in such cases are in substance payments of principal and interest either on a loan secured by the leased real property or on the purchase of the leased real property." *Id.* The fact that the facilities rentals are payments of principal and interest indicates a financing lease under the legislative history and gives further support to United's position. Where the *raison d'etre* is expressly to enable a financing, a finding that the resulting lease is not a "true lease" for purposes of Section 365(d)(3) of the Bankruptcy Code is required. *See* S. Rep. No. 989, 95th Cong., 2d Sess. 64, 1978 U.S.C.C.A.N. 5787, 5850.

In this case, the absence of an absolute "ownership interest" requirement makes sense, because the pertinent question in this analysis is whether the lessor should be given the protections inherent to § 365 of the Bankruptcy Code. The focus is rightfully, therefore, on whether the *lessor* is a true lessor, and not whether the *lessee* is a true lessee. Irrespective of United's economic interest at the conclusion of the lease term, the fact remains that the RAIC -- the purported lessor -- could not expect the return of an economic interest of any type at the end of the lease term. It is the lack of the lessor's expectation in a post-lease-term interest in the

property that is critical, *not* whether the lessee's post-lease-term interest takes the form of an ownership interest. As one court explained,

> "[i]f a lease contains an option to purchase for no or nominal consideration . . . it suggests that the lessor does not care, in an economic sense, whether or not the option is exercised. If the lessee develops equity in the leased property such that the only sensible decision economically for the lessee is to exercise the option . . . it suggests the ***lessor did not expect the return of the leased goods***."

*Addison v. Burnett*, 41 Cal. App. 4th 1288, 1296 (Cal. Ct. App. 1996) (emphasis added) (quoting *In re Zaleha*, 159 B.R. 581, 585 (D. Idaho 1993)). It is precisely this analysis of the lessor's economic interest that renders the question of whether or not the subject property will have "substantial value" when the LAX Sublease expires largely superfluous. *See SCCC Assocs.*, 158 B.R. at 1013.

> 6. U.S. Bank's Attempt To Collapse The Multi-Factor Economic Realities Analysis Into "Touchstones" Should be Rejected.

U.S. Bank argues that the LAX Sublease must be characterized as a true lease based upon the application of certain "touchstones" that U.S. Bank asserts to be essential for recharacterizing a lease as a financing arrangement. These "touchstones" coincidentally include the requirement that there exist a purchase provision for the lessee of the property at issue and/or that the property have no value after the term of the lease. Appellant's Brief, at 12 (Appeal Docket No. 12).

As discussed above, the fact that the agreement lacks a purchase provision does not suggest that the LAX Sublease is a true lease. In addition, U.S. Bank fails to cite a single case standing for the proposition that its self-proclaimed touchstones must be present before a court will recharacterize a lease. This Court should reject this untenable position that U.S. Bank's so-called "touchstones" are dispositive of the recharacterization issue.

> 7. The Facts Underlying The Denver Airport Agreement Support United's Argument That The LAX Sublease Is A Financing Arrangement

22

U.S. bank argues that its transaction is the same as the Denver lease, which the Bankruptcy Court found to be a true lease. Appellant's Brief, at 26 (Appeal Docket No. 12). While the Bankruptcy Court correctly analyzed the LAX, SFO, and JFK Bond Agreements to determine their economic substance, it did not apply that same analysis to the Financing Portions of the Special Facilities and Ground Lease in Denver. Rather, the Bankruptcy Court dealt only with the issue of whether the Special Facilities and Ground Lease is severable. *See* Memorandum of Decision, at 26-28 (Docket No. 128). After reaching its conclusion on severability, the Bankruptcy Court stopped its analysis and did not consider the merits of whether the agreement should be recharacterized. *Id* at 26-27

However, a proper application of the law of contract severability reveals that the Denver Special Facilities and Ground Lease is in substance two separate agreements with two completely different purposes that were simply drafted on the same piece of paper out of convenience. Application of the "economic substance" factors to the Financing Portions of the Denver Special Facilities and Ground Lease confirms that the Financing Portions are substantively no different than the financing arrangements at LAX, SFO, and JFK. Thus, the facts involving the Denver Airport support the position that the LAX Sublease is not a true lease.

8.   <u>United's Alleged Representations Indicating An Intent to Create A True Lease Do Not Establish That The LAX Sublease Is, In Fact, A True Lease</u>

U.S. Bank argues that recharacterization is not warranted because the parties intended to create a true lease. Appellant's Brief, at 27 (Appeal Docket No. 12). However, as the Bankruptcy Court stated, a party is free to represent a transaction one way before an agency for tax purposes and treat it another way in a different context. Memorandum of Decision (Docket No. 128), *citing Frank Lyon Co. v. United States*, 435 U.S. 561, 584 (1978).

Moreover, it is not uncommon for a transaction to be characterized as a lease for tax or accounting purposes, yet to be characterized as a financing for bankruptcy purposes. This is precisely why a consideration of how the lease would be treated under the tax code is irrelevant and why reliance on cases construing the "economic realities" of the lease for tax purposes is misplaced.

**G.     CONCLUSION**

The Bankruptcy Court was correct in applying the "economic realities of the transaction" test to the Facilities Sublease, and determining that the LAX Sublease is not a true lease for purposes of Section 365 of the Bankruptcy Code. The standard proposed by U.S. Bank in its opening brief, referred to as the "touchstone" factors test but disguised in other forms as well, would reduce the Bankruptcy Court's analysis to one paramount factor: can the purported lessee acquire a legitimate ownership interest in the subject property at the expiration of the term of the lease? In the context of airport revenue bond financings, where (as here) the "lessee" is prohibited by operation of law from owning property at the city airport, this standard makes little sense. Nor is this standard articulated in, or supported by, a single case in federal or California law. Its suggested use can only stem from U.S. Bank's desire to create a standard that is impossible for United to fulfill.

In its analysis, the Bankruptcy Court properly ignored U.S. Bank's overtures regarding the "touchstone" factors, and found that each and every part of the "economic realities of the transaction" test favored United's position that the LAX Sublease is a financing arrangement, and not a true lease. The Bankruptcy Court's analysis in this regard was thorough, well-reasoned, and should not be disturbed on appeal.

For all the foregoing reasons, United respectfully requests this Court deny U.S. Bank's appeal from the summary judgment order of the Bankruptcy Court in its entirety.

Dated: Chicago, Illinois                Respectfully Submitted,
      July 1, 2004

                                                   _Todd Gale_

                                James H.M. Sprayregen, P.C. (ARDC No. 6190206)
                                Marc Kieselstein (ARDC No. 6199255)
                                Todd Gale (ARDC No. 6229288)
                                KIRKLAND & ELLIS, LLP
                                200 East Randolph Drive
                                Chicago, Illinois  60601
                                Telephone: (312) 861-2000
                                Facsimile: (312) 861-2200

                                Counsel for Plaintiff / Appellee
                                United Air Lines, Inc.

## CERTIFICATE OF SERVICE

        I, Christopher L. McCall, certify that on the 1st day of July 2004, I caused to be served, by e-mail, facsimile, courier or overnight mail, a true and correct copy of the foregoing RESPONSE OF APPELLEE UNITED AIR LINES, INC. IN OPPOSITION TO BRIEF OF APPELLANT U.S. BANK NATIONAL ASSOCIATION, NOTICE OF MOTION and MOTION OF THE APPELLEE FOR LEAVE TO FILE BRIEF IN EXCESS OF FIFTEEN PAGES, on the parties on the attached service list.

Dated: July 1, 2004

                                       Christopher L. McCall

| | |
|---|---|
| Mark E. Leipold<br>Mark E. Abraham<br>Gould & Ratner<br>222 North LaSalle Street<br>8th Floor<br>Chicago, Illinois 60601-1011 | Patrick J. McLaughlin<br>Katherine A. Constantine<br>Steven J. Heim<br>Dorsey & Whitney, LLP<br>50 South Sixth Street<br>Suite 1500<br>Minneapolis, Minnesota 55402-1498 |

## CORE GROUP SERVICE LIST

| | |
|---|---|
| Debtors:<br>United Air Lines, Inc.<br>WHQLD<br>1200 East Algonquin Road<br>Elk Grove Village, Illinois 60007<br>Attn: John Lakosil<br>Phone: (847) 700-4462<br>Facsimile: (847) 700-4683 | Counsel to Debtors and Debtors in Possession:<br>Kirkland & Ellis<br>200 East Randolph Street<br>Chicago, Illinois 60601<br>Attn: James H.M. Sprayregen, P.C.<br>Marc Kieselstein<br>David R. Seligman<br>Steven Kotarba<br>Phone: (312) 861-2000<br>Facsimile: (312) 861-2200 |
| Office of the United States Trustee:<br>227 West Monroe Street, Suite 3350<br>Chicago, Illinois 60606<br>Attn: Ira Bodenstein<br>Kathryn Gleason<br>Stephen Wolfe<br>Phone: (312) 886-5785<br>Facsimile: (312) 886-5794 | Counsel to the Debtors' debtor in possession<br>lender (Bank One):<br>Latham & Watkins<br>233 South Wacker Drive, Suite 5800<br>Chicago, Illinois 60606<br>Attn: David Heller<br>Timothy Barnes<br>Phone: (312) 876-7700<br>Facsimile: (312) 993-9767 |
| Counsel to the Debtors' debtor in possession<br>lender (CIT Group):<br>Schulte, Roth & Zabel<br>919 Third Avenue<br>New York, New York 10022<br>Attn: Robert J. Mrofka<br>Phone: (212) 756-2000<br>Facsimile: (212) 593-5955 | Counsel to the Debtors' debtor in possession<br>lender (Citibank and JP Morgan):<br>Morgan, Lewis & Bockius, LLP<br>101 Park Avenue<br>New York, New York 10178<br>Attn: Richard S. Toder<br>Jay Teitelbaum<br>Phone: (212) 309-6000<br>Facsimile: (212) 309-6001 |
| Counsel to the Debtors' debtor in possession<br>lender (Citibank and JP Morgan):<br>Kaye Scholer, LLP<br>3 First National Plaza, Suite 4100<br>70 West Madison Street<br>Chicago, Illinois 60602<br>Attn: Michael B. Solow<br>Phone: (312) 583-2300<br>Facsimile: (312) 583-2360 | Debtors' Private Copy Service:<br>Merrill Corporation<br>250 South Wacker Drive, 4th Floor<br>Chicago, Illinois 60606<br>Attn: Allison Clark<br>Phone: (312) 930-2123<br>Facsimile: (312) 454-8564 |
| Official Notice and Claims Agent:<br>Poorman-Douglas Corporation<br>10300 SW Allen Boulevard<br>Beaverton, Oregon 97005<br>Attn: Rhonda G. McNally<br>Phone: (503) 277-7999<br>Facsimile: (503) 350-5230 | Counsel to Committee:<br>Sonnenschein, Nath & Rosenthal<br>8000 Sears Tower<br>233 S. Wacker Drive<br>Chicago, Illinois 60604<br>Attn: Fruman Jacobson<br>Robert E. Richards<br>Phone: (312) 876-8123<br>Facsimile: (312) 876-7934 |
| Counsel to Committee:<br>Sonnenschein, Nath & Rosenthal<br>1221 Avenue of the Americas<br>24th Place<br>New York, New York 10020<br>Attn: Carole Neville<br>Phone: (212) 768-6889<br>Facsimile: (212) 768-6800 | |