IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION,<br><br>    Appellant,<br><br>    v.<br><br>UNITED AIR LINES, INC.,<br><br>    Appellee.<br><br>THE CITY OF LOS ANGELES,<br><br>    Appellant,<br><br>    v.<br><br>UNITED AIR LINES, INC.,<br><br>    Appellee.<br><br>REGIONAL AIRPORTS IMPROVEMENT CORPORATION,<br><br>    Appellant,<br><br>    v.<br><br>UNITED AIR LINES, INC.,<br><br>    Appellee. | Case Nos. 04 C 3357<br>04 C 3358<br>04 C 3359<br><br>Honorable John W. Darrah |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on the appeal of the judgment of the bankruptcy court of March 30, 2004, by U.S. Bank National Association ("U.S. Bank"), the City of Los Angeles ("the City") and the Regional Airports Improvement Corporation (" the RAIC"). The bankruptcy court

granted summary judgment, ruling *inter alia*, that purported leases held by United were in fact financing agreements for purposes of applying the bankruptcy code. For the reasons that follow, the decision of the bankruptcy court is affirmed in part and reversed in part.

## BACKGROUND

The City owns and operates Los Angeles International Airport ("LAX"). The cost of airport operations is generally paid by the users of the airport, and there is no cost to the general taxpayers. No profit generated at LAX may be used for purposes outside the City's airport system. The City is not permitted to convey any ownership interest or title to airport land at LAX.

In 1969, the City caused the formation of the RAIC. The RAIC is a non-profit benefit corporation. The stated purpose of the RAIC is to assist the City by financing and otherwise assisting the City, directly or indirectly, in acquiring, constructing, and improving airports, heliports, and facilities thereof. The RAIC is specifically prohibited from engaging in any other business activity that is not incidental, necessary or convenient with respect to the foregoing. Upon the dissolution, liquidation, or winding up of the RAIC and after payment or provision of its liabilities, any remaining assets are to be distributed to the City. Since 1980, RAIC has been involved in virtually all major domestic terminal projects at LAX.

In June 1981, United entered into a "Terminal Lease" with the City. The Terminal Lease requires United to undertake construction of certain "Lessee Improvements" at LAX. The Terminal Lease expressly contemplated that the construction of the Lessee Improvements could be financed by the RAIC through its assurance of special revenue bonds. To the extent that Lessee Improvements are financed in this manner, the improvements are referred to as the "RAIC Facilities." However, such financing would be on behalf of the City. Title to the RAIC Facilities

is held by the City.

Section 21(B) of the Terminal Lease sets out the following mechanism for the RAIC financing:

> Should this nonprofit financing program through the Corporation [RAIC] be utilized, it will in general include the following steps: Lessee [United] shall assign this Lease, as it pertains and applies to RAIC Facilities, to Corporation; Corporation shall sublease the RAIC Facilities to Lessee pursuant to a "Facilities Sublease"; City hereby grants to Corporation, so long as it has any interest in the RAIC Facilities, easements of ingress and egress over the common roadways and taxiways at Airport; Corporation will issue its Bonds secured by the Indenture between Corporation and the Trustee, to provide funds for the acquisition, construction, modification, expansion and installation of the RAIC Facilities and to pay other costs related thereto; thereafter, Corporation may issue additional bonds ("Additional Bonds") pursuant to [sic] provide additional funds for such purposes, and may also issue refunding bonds ("Refunding Bonds") for the purpose of refunding any Bonds.

As contemplated by the Terminal Lease, the following documents were executed: (1) Partial Assignment of Terminal Facilities Lease dated as of November 15, 1982, between United and the RAIC (the "Partial Assignment"); (2) Facilities Sublease dated as of November 15, 1982, between United and the RAIC (the "Facilities Sublease"); and (3) the Contingent Lease Agreement dated as of November 15, 1982, between the City and the RAIC (the "Contingent Lease").

Through the Partial Assignment, United assigned to RAIC all of its rights, title, and interest in the Terminal Lease as it relates to the RAIC Facilities. As consideration for such assignment, the RAIC agreed to enter into the Facilities Sublease with United whereby it would lease the RAIC Facilities to United. The term of the Partial Assignment ends upon termination of the Facilities Sublease.

Through the Facilities Sublease, the RAIC leased to United all of the RAIC Facilities to be constructed in exchange for the payment of rent comprised of Facility Rent equal to the interest, premium, if any, and principal due on the bonds issued by the RAIC and additional rent equal to the expenses of the RAIC. The term of the Facilities Sublease is coterminious with the payment in full or redemption of all bonds issued by the RAIC. Pursuant to the Facilities Sublease, United is obligated to keep RAIC Facilities in good condition, repair, and working order such that the RAIC Facilities will have a residual value, without regard to inflation, at the end of the term of the Facilities Sublease, of at least 20% of its original cost. The Facilities Sublease also contained default and remedy provisions, including an authorization for the RAIC to remove United from the RAIC Facilities in the event of default and to allow re-letting the RAIC Facilities.

The Contingent Lease effectuated the RAIC's rights in the event of a default by United under the Facilities Sublease. In the event that United's rights under the Facilities Lease are terminated because of United's default, the City will grant the RAIC a 90-day option to enter into a new Ground Lease, on the same terms offered to United, for the balance of the remaining term of the Ground Lease.

Contemporaneously with the execution of the above instruments, the RAIC entered into an Indenture of Mortgage and Deed of Trust dated November 15, 1982, between the RAIC and U.S. Bank as indenture trustees pursuant to which certain bonds were issued. The proceeds from these bonds were used to fund the construction of the RAIC Facilities.

On December 9, 2002, United filed a voluntary petition under Chapter 11 of Title 11, United States Code. On March 21, 2003, United filed an Adversary Complaint, seeking a declaratory judgment that certain of its payment obligations related to airport improvements were not obligations

arising under "leases" pursuant to Section 365 of the Bankruptcy Code. Subsequently, all parties moved for summary judgment on the issue of whether the "leases" were true leases, as opposed to financing instruments.

On March 4, 2004, the bankruptcy court granted United's motion for summary judgment. Applying what is commonly referred to as the economic realities test, instead of California state law, the bankruptcy court held that the Facilities Lease between the RAIC and United was not a true lease for purposes of Bankruptcy Code § 365.

U.S. Bank, the City, and the RAIC appeal the bankruptcy court's judgment to this Court. Although the parties filed separate appeals, the issues on appeal of each of the parties can be summarized as: (1) Did the bankruptcy court err in granting United's motion for summary judgment and denying the Appellants' motions for summary judgment in determining that the Facilities Lease was not a true lease under Section 365; (2) Did the bankruptcy court err in its application of economic realities test; and (3) Did the bankruptcy court err in determining that the Terminal Lease and the Facilities Sublease were not an integrated agreement.

## LEGAL STANDARD

A bankruptcy court's grant of summary judgment is reviewed *de novo*. *Hoseman v. Weinschneider*, 322 F.3d 468, 473 (7th Cir. 2003) (*Hoseman*). All of the facts and the inferences therefrom are viewed in a light most favorable to the nonmoving party. *Hoseman*, 322 F.3d at 473. Similarly, a bankruptcy court's interpretation of statute is a question of law reviewed *de novo*. *See Meyer v. Rigolon*, 30 F.3d 1375, 1378 (7th Cir. 1994). The Court reviews the bankruptcy court's factual findings for clear error. *Hoseman*, 322 F.3d at 473.

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). All the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mut. Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## **DISCUSSION**

The Appellants contend that the bankruptcy court incorrectly held that the Facilities Lease was not a true lease in determining the inapplicability of § 365.

Section 365(a) provides the trustee, or debtor-in-possession in Chapter 11 cases, the power to assume or reject unexpired leases. 11 U.S.C. § 365(a). Certain requirements are imposed when the trustee wishes to assume an unexpired lease under which there has been a default. The trustee must cure the default, compensate any parties that have suffered pecuniary loss from the default, and provide adequate assurance of future performance under the lease. 11 U.S.C. § 365(b). Leases of nonresidential real property are deemed rejected unless assumed within sixty days after an order for relief unless the court, for cause, grants additional time during that sixty-day period. 11 U.S.C. § 365(d).

In order for Section 365 to apply, the lease between the parties must be a "true" or "bona fide" lease. *See In re Moreggia & Sons, Inc.*, 852 F.2d 1179, 1182 (9th Cir. 1988) (*Moreggia*); *In re Powers*, 983 F.2d 88, 89 (7th Cir. 1993) (deciding whether rental agreements were true leases) (*Powers*); *In re Lunan Family Restuarants*, 194 B.R. 429, 450 (N.D. Ill. 1996); *In re Hotel Syracuse, Inc.*, 155 B.R. 824, 838 (N.D.N.Y. 1993) (*Hotel Syracuse*).

The bankruptcy court applied the economic realities substance test in determining that the Facilities Lease was not a true or bona fide lease. In a different appeal to this Court addressing this same issue, this Court found that the bankruptcy court erred in applying the economic realities test in determining whether a lease, under facts similar to the instant case, was a true or bona fide lease. *See In re UAL*, 2004 WL 2609196 (04 C 2836 & 04 C 2837) (Nov. 18, 2004); *see also Powers*, 983 F.2d at 90; *In re Pillowtex, Inc.*, 349 F.3d 711, 716 (3rd Cir. 2003) (*Pillowtex*); *In re Sankey*, 307 B.R. 674, 678 (D. Alaska 2004); *In re Pittsburgh Sports Assoc. Holding Co.*, 239 B.R. 75, 83 (W.D. Pa. 1999) (*Pittsburgh Sports*); *In re Fox*, 229 B.R. 160, 164 (N.D. Ohio 1998); *In re DWE Screw Prod., Inc.*, 157 B.R. 326, 330 (N.D. Ohio 1993) (*DWE*) (collectively applying state law in determining whether a lease is a true lease for purposes of Section 365). In *In re UAL*, this Court held that, pursuant to applicable choice of law considerations, the bankruptcy court erroneously applied the economic realities test instead of the applicable state law in determining whether the lease was a true or bona fide lease. *See In re UAL*, 2004 WL 2609196 at * 5. Accordingly, the bankruptcy court in the instant case erred when it applied the economic realities test in determining whether the Facilities Lease was a true lease.

Under California law[1], an agreement is *presumptively* a lease of real property if it includes a designation of the parties, contains a definite description of the leased property, provides for periodic payment of rent for the term of the lease, and provides a right to occupy the property to the exclusion of the grantor. *See In re SCCC Assoc. II Ltd.*, 158 B.R. 1004, 1013 (N.D. Cal. 1993) (*SCCC*) (emphasis added).

Here, the Facilities Lease designates the parties, contains a definite description of the leased property, provides for periodic payment of rent over the term of the lease, and provides United with a right to occupy the leased premises to the exclusion of the grantor. Accordingly, the Facilities Lease is presumed to be a true lease under California law. This presumption may be rebutted by United by establishing by *clear and convincing evidence* that the parties intended for the Facilities Lease to disguise a substantive transfer of ownership or an encumbrance of the leased SFO Maintenance Facility. *See SCCC*, 15 B.R. at 1009-14; *Fox v. Peck Iron & Metal Co.*, 25 B.R. 674, 688 (S.D. Cal. 1982) (*Fox*) (emphasis added).

Whether a lease agreement is a true lease or one intended solely for security is determined by the intent of the parties at the time of the execution of the document. *See Fox*, 25 B.R. at 688. The intent of the parties is determined by reviewing all facts and circumstances of the transaction, including the economic substance of the transaction. *See Fox*, 25 B.R. at 688; *Nite Lite*, 13 B.R. at 908. Factors considered in this analysis include: (1) whether the transaction actually transfers the normal risks and responsibilities of landlord to the lessor; (2) whether the payments under the lease are reasonably designed to compensate the lessor for the use of the property or simply reflect the

---

[1] The parties agree that California law is the state law to be applied to the Facilities Lease at issue *if* state law is to be applied.

-8-

repayment of the lessor's acquisition cost plus interest; *Fox*, 25 B.R. at 688; and (3) whether the lessor retains an economically significant interest in the property, *SCCC*, 158 B.R. at 1013.

The application of these factors to the facts demonstrates that the Facilities Lease was a true lease. The Facilities Lease requires United to pay the taxes, maintenance, and insurance – generally referred to as a triple net lease. While the payment of taxes, maintenance, and insurance are typically viewed as usual obligations indicating ownership, as opposed to a landlord-tenant relationship, the use of triple net leases are not unusual terms in ground leases. *See SCCC*, 158 B.R. at 1013. Furthermore, United concedes that it could never own the leased property or facilities. As such, United's responsibilities under the lease that are generally an indicia of ownership fail to demonstrate that the Lease is not a true lease.

The payments under the Lease are also reasonably designed to compensate Appellants. The aggregate rental payments required by the Facilities Lease include the amount needed to pay the bonds in accordance with their terms and the administrative costs associated therewith. However, the amount of the rental payments also constitutes reasonable compensation for the use and occupation of the RAIC Facilities. Furthermore, rent payments are frequently calculated with reference to payment in respect to financing obligations. *See City of Desert Hot Springs v. County of Riverside*, 154 Cal. Rptr. 297, 301 (1979) (*Desert Springs*). A "'lease-leaseback' arrangement 'as a method of financing construction' is not inconsistent with the existence of a lease." *Desert Springs*, 154 Cal. Rptr. at 301. In addition, United could terminate the Facilities Lease by prepaying the rent due for the lease term; but there is no reduction in rent corresponding to the shorter lease term in the event of prepayment. An absolute obligation to pay rent for the full lease term is indicative of a true lease. *See 7 Miller & Star California Real Estate* § 19.86 (3d ed. 2001).

Lastly, the lessor retained an economically significant interest in the property leased to United, and United retained no interest in the leased property upon completion of the lease. United concedes that it did not own, will not own, and cannot ever own any of the facilities leased to United. The Facilities Lease does not provide United with an option to purchase at the end of the lease.

The City also argues that the bankruptcy court erred in finding that the Terminal Lease and Facilities Sublease are not integrated into a single agreement. The parties agree that the question of whether the leases are integrated must be determined under applicable state law; here, the law of California. *See In re Pollack*, 139 B.R. 938, 940 (9th Cir. B.A.P. 1992) (*Pollack*).

Under California law, the relevant factors in determining whether documents are integrated include: (1) whether the purpose and nature of the obligations differ, (2) whether the consideration for the obligations is separate and distinct, and (3) whether the obligations of the parties are interrelated. *See Pollack*, 139 B.R. at 940.

In the instant case, the purpose and nature of the Terminal Lease and the Facilities Sublease, while overlapping in some areas, are different. The Terminal Lease involves United's overall operations at LAX, including numerous facilities; and the Facilities Sublease is much narrower, involving only those facilities improved via the bonds from the RAIC. Although the Facilities Sublease allows for financing from the RAIC for the RAIC Facilities, United was not required to use the RAIC for its improvements. The City concedes that the consideration for each of the two leases is separate and distinct. Lastly, the obligations of the parties are distinct: United has separate payment obligations under the Terminal Lease and the Facilities Sublease; the City has traditional duties of a lessor under the Terminal Lease; and the RAIC has no significant duties under the

Facilities Sublease. Accordingly, the bankruptcy court did not err in finding that the Terminal Lease and Facilities Sublease were not integrated.

## CONCLUSION

Based on the foregoing, the March 30, 2004 judgment of the bankruptcy court order is affirmed in part and reversed in part. The bankruptcy court's ruling that the Terminal Lease and the Facilities Sublease are not integrated is affirmed. The bankruptcy court's judgment granting summary judgment in favor of United, based on its finding that the Facilities Sublease was not a true lease, is reversed.

Date: January 24, 2005

John W. Darrah, Judge
United States District Court